**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Richard P. Matsch**

Civil Action No. 13-cv-0363-RPM

GINA HOLUB,

    Plaintiff,

v.

CHRIS GDOWSKI, SHELLEY BECKER, MARK HINSON, NORM JENNINGS, and
ADAMS 12 FIVE STAR SCHOOLS,

    Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Plaintiff Gina Holub is a former employee of Defendant Adams 12 Five Star School District ("the School District" or "the District") whose employment was terminated in October 2012. The individual Defendants are Chris Gdowski, superintendent of the School District; Shelly Becker, chief financial officer of the School District; Mark Hinson, the School District's assistant-superintendent of human resources; and Norm Jennings, a member of the School District's Board of Education ("School Board" or "Board"). In her Second Amended Complaint, Holub brought the following claims against all Defendants except Norm Jennings: (1) First Amendment retaliation under 42 U.S.C. § 1983; (2) breach of contract; (3) intentional interference with a contractual relationship; and (4) wrongful discharge in violation of public policy. Holub also asserted a defamation claim against Superintendent Gdowski and Jennings. In her Response to Defendants' Motion for

Summary Judgment, Holub agreed to dismiss Chief HR Officer Hinson and Norm Jennings from the case.  [Doc. 57 at 2.]

## FACTUAL BACKGROUND

The following facts are material and not in genuine dispute.  The School District hired Gina Holub as its Internal Auditor and she began work in January of 2007.  Holub's contract with the District provided that she could be terminated for "cause."  [Doc. 55, Ex. B ¶ 9.] Holub's job duties required her to, *inter alia*:

> Analyze data for internal audit.  Determine the adequacy and effectiveness of the district's systems of internal accounting and operating controls.  Review the reliability and integrity of financial information and the means used to identify, measure, classify and report such information.
> . . .
> Report to those members of management who should be informed or who should take corrective action, the results of audit examinations, the audit opinions formed, and the recommendations made.
> . . .
> Communicate results of internal audit to stakeholders.

[Doc. 55, Ex. C at 2.]

Holub reported to the School District's CFO.  When Holub was hired, Becky Samborski was the District's CFO.  During Ms. Samborski's tenure, the District had a recurring problem with underspending budgeted amounts in areas that could not be identified.  [Doc. 55, Ex. D ¶ 2.]  Samborski left the School District in October 2011.

Shelley Becker was hired as the District's new CFO in December of 2011. CFO Becker immediately identified a number of issues with the District's prior budgeting practices, and within the first few months of her employment she began the process of converting the District to line-item budgeting to allow the District to more accurately compare budgeted

funds to actual expenditures.  One of the goals of this conversion was to identify the areas of underspending so future budgets would be more accurate.  [Id. ¶¶ 3-4; Doc. 55, Ex. E ¶ 1.]

In mid-April 2012, CFO Becker asked Tracey Cantrell, the fiscal manager for the District's student support services department, to perform an analysis of the District's full-time equivalent employees ("FTEs").  [Doc. 57, Ex. 1 ¶ 3.]  Cantrell determined that there was at least $12 million in unverifiable FTE salary expenses built into the District's budget, which she reported to CFO Becker.

In June 2012, Gina Holub expressed concern to Superintendent Gdowski that reporting to CFO Becker was a conflict of interest, and stated that the Internal Auditor should instead report to the Superintendent.  [Doc. 55, Ex. F at 72:13-18; 76:17-22.]  Superintendent Gdowski asked Holub to research the proper reporting structure for an internal auditor and get back to him.  [Id. at 72:19-24; 76:17-22.]  Holub responded to Superintendent Gdowski by e-mail on July 12, 2012.  She sent him the Attribute Standards from the Institute of Internal Auditors' website and quoted the following specific provisions:

**1100 – Independency & Objectivity**

'To achieve the degree of Independence necessary to effectively carry out the responsibilities of the internal audit activity, the chief audit executive has direct and unrestricted access to senior management ***and the board***. This can be achieved through a dual-reporting relationship.'

**1110 – Organizational Independence**

'The chief audit executive must report to a level within the organization that allows the internal audit activity to fulfill its responsibilities. The chief audit executive must confirm ***to the board***, at least annually, the organizational independence of the internal audit activity.' 'Organizational independence is effectively achieved when the chief audit executive reports functionally ***to the board***.'

**1111 – Direct Interaction with the Board**

'The chief audit executive must communicate and interact directly *with the board*.'

. . .

**2060 – Reporting to Senior Management and the Board**

'The chief audit executive must report periodically to senior management *and the board* on the internal audit activities purpose, authority, responsibility, and performance relative to its plan. Reporting must also include significant risk exposures and control issues, including fraud risks, governance issues, and other matters needed or requested by senior management *and the board.*'

[Doc. 55, Ex. G (emphasis added).]   Holub noted in her e-mail that the position of "chief audit executive" in the Attribute Standards appeared to match her job as the School District's Internal Auditor.

In June 2012, Holub analyzed the fiscal year 2012-2013 budget.   Holub contacted Superintendent Gdowski and expressed her concerns that the budget contained $17 million in excess salary expenses and that improper "plugs" might have been used to balance the budget.  [Doc. 34 ¶5; Doc. 55, Ex. D ¶ 6].   In response, Superintendent Gdowski encouraged CFO Becker to meet with the finance department to work through Holub's issues. [Doc. 55, Ex. D ¶ 6].

Superintendent Gdowski e-mailed Holub on June 21 and said that he wanted her to meet the School Board at the Board's August meeting so they could learn more about her work and have her as a resource if they had any issues with himself or with CFO Becker in the future.  [Doc. 55, Ex. H.]   Superintendent Gdowski stated that he wanted Holub to get to know the Board so she could contact them if she believed he was violating laws or District policies or that he was failing to respond to allegations of noncompliance by other District staff members.  [Doc. 55, Ex. D ¶ 8].

4

After Holub sent Superintendent Gdowski a list of specific questions about various budget issues, he arranged a meeting with Holub, CFO Becker, Chief HR Officer Mark Hinson, and General Counsel Cheryl Karstaedt; and invited CFO Becker to bring the District's consultant, Vickie Lisco, the Budget Manager, Rose Ann Barranco, or anyone else from her staff who might be able to assist in answering Ms. Holub's questions. [Doc. 55, Ex. D ¶ 7.]  The meeting was held on July 24, 2012.  Holub was not satisfied with the answers CFO Becker and Ms. Lisco provided and came out of the meeting with additional questions in her mind regarding the School District's budget practices.

During three more meetings with Holub, CFO Becker and other members of the budget and finance teams, as well as Chief HR Officer Hinson, attempted to address Holub's concerns and explain how the figures that made up the 2012-2013 fiscal year budget were derived from financial records.  [Doc. 55, Ex. D ¶ 9; Ex. E ¶¶ 3-4; Ex. W ¶ 2; Ex. I at 7-8.]  Aware that the District was negotiating with the teachers' union at the time, Holub expressed concern during the meetings that the District was using the alleged excess expenses as an improper reason to cut or slow the growth of teacher salaries.  [Doc. 34 ¶ 8.]

Superintendent Gdowski was satisfied with the explanations provided by CFO Becker and her staff at the meetings and believed that Holub's claim of inflated salary expenditures was incorrect. [Doc. 55, Ex. D ¶ 10].  Holub was not satisfied.

On August 13, 2012, Holub contacted Mark Clark, President of the School Board, and told him she believed there were inflated salary expenses in the budget; she asked to present her "findings" to the Board.  [Doc. 55, Ex. I at 8.]  Holub stated that she was concerned about retaliation but Clark assured her that she should not worry about retaliation because she was "doing what they hired [her] to do."  [Id.]

5

Superintendent Gdowski introduced Holub to the Board on August 15.  [Doc. 55, Ex. I at 8; Ex. D ¶ 8.]  Superintendent Gdowski informed the Board in Holub's presence that he believed the Internal Auditor should be permitted to approach the Board if she believed he was violating laws or District policies concerning finances or that he was not responding adequately to concerns about other School District managers.  [Doc. 55, Ex. D ¶ 8.]

Superintendent Gdowski wrote to Holub on August 17 to indicate that he was planning to schedule a meeting with her and School Board President Clark to talk about the 2012-2013 budget.  [Doc. 55, Ex. J.]  That day, Holub renewed her employment contract for the period from July 1, 2012, to June 30, 2013.  [Doc. 55, Ex. B.]

On August 19, 2012, Holub responded to Superintendent Gdowski's e-mail, stating that she wanted to present her "findings and concerns" to the Board, and asked School Board President Clark's assistant to verify that the "appropriate people are invited and attend the meeting."  [Doc. 55, Ex. K.]  Superintendent Gdowski responded that while he did not believe Holub had raised valid concerns regarding the 2012-2013 budget and would not recommend that the Board hear her concerns in a public meeting, he would see if School Board President Clark wanted to meet with just the three of them, have a colleague on the Board join him, or have the entire Board hear her concerns in a public meeting.  [Doc. 55, Ex. L.]

On August 21, Holub sent Superintendent Gdowski a memo in which she claimed that the District was acting illegally and unethically by using inflated salary figures to achieve a fund balance of 10% of expenditures, citing various statutes and accounting standards she believed were implicated.  [Doc. 34 ¶ 10; Doc. 55, Ex. I at 8; Doc. 55, Ex. D ¶ 11.]  School Board policy required the District to budget to a 10% fund balance. Superintendent Gdowski

6

did not believe that Holub's claim was supported by any information he had seen during the four earlier meetings.  [Doc. 55, Ex. D ¶ 11.]  Because Holub was specifically accusing the District of illegal and unethical conduct, Superintendent Gdowski decided to bring in an independent expert in school budget and finance to review the matter.  He directed General Counsel Karstaedt to retain the independent expert, investigate Holub's claims along with the expert, and report back to the School Board.  [Doc. 34 ¶10; Doc. 55, Ex. D ¶ 12.]

The School District hired Vody Herrmann, a former Assistant Commissioner for Public School Finance with the Colorado Department of Education and a well-known and well-respected figure in the field of school budget and finance, to serve as the independent expert in the investigation.  [Doc. 55, Ex. D ¶ 13; Doc. 55, Ex. E ¶ 6.]  Herrmann met with Holub and reviewed Holub's supporting documents; met separately with CFO Becker and Budget Consultant Lisco and reviewed the documents they had used while preparing the budget and responding to Holub's inquiries; and also looked at prior years' financials to determine whether any issues were new or were ongoing from the previous administration.  In total, Herrmann spent about 70 hours on her review.  [Doc. 55, Ex. D ¶ 13; Doc. 55, Ex. E ¶ 6.]

On August 29, 2012, before Ms. Herrmann had completed her review, Holub e-mailed Superintendent Gdowski and stated that, regardless of what conclusions Herrmann reached, she (Holub) still wanted to present her own findings to the Board of Education.  Holub stated:  "I have a responsibility in my position to report to the Board when I think there is an issue that they should be aware of."  [Doc. 55, Ex. M.]  General Counsel Karstaedt responded to Holub's e-mail, stating that the Board would determine whether or not to request a presentation from her.  The Board never requested such a presentation.  [Doc. 34 ¶12.]

7

On September 5, 2012, again before Ms. Herrmann had completed her review, Holub expressed her concerns regarding the District's budget to Amie Baca, a representative of the local teachers' union. Holub stated that she believed the District's budget expenses had been intentionally inflated by approximately $17 million. [Doc. 34 at ¶ 13.] On September 11, Holub met with Rob Kellogg, a director with the Colorado Education Association (the state teachers' union), and told him the same thing. [Doc. 34 ¶15; Doc. 55, Ex. F at 167:23-168:4.]

On September 20, 2012, Vody Herrmann presented her findings to Holub, Superintendent Gdowski, CFO Becker, General Counsel Karstaedt, and Chief HR Officer Hinson. Herrmann concluded that for several years the District had had a recurring problem with underspending of its budget, which the District was aware of and was already taking steps to address. Herrmann specifically found that while there were concerns that needed to be addressed and improvements that needed to be made with the District's budgeting, there was no illegal or unethical budget activity taking place. [Doc. 34 ¶16; Doc. 55, Ex. D ¶ 16; Ex. E ¶ 7; Ex. W ¶ 4.] Herrmann rejected Holub's contention that the salary expenses for the 2012-2013 budget were inflated by $17 million and concluded that there was very little variance in the District's budgeted salary to actual salary expenses. Herrmann noted that Holub's calculation of salary expenses had not included a number of items that were counted in the budgeted salary figures, such as retirement stipends, coaching stipends, extra duty and overtime pay, professional leave, and military leave. [Doc. 55, Ex. D ¶ 17; Ex. E ¶ 7; Ex. W ¶ 4.] According to Chief HR Officer Hinson, Holub was "visibly angry and clearly unable to accept that she might have been wrong" after Herrmann presented her conclusions. [Doc. 55, Ex. W ¶ 4.]

8

At the end of the meeting, Superintendent Gdowski told Holub that they needed to fix the problems Herrmann identified working as a team, which would require that they trust each other to be acting in good faith and for the good of the District.  Gdowski asked Holub to contact him if she wanted to discuss any outstanding concerns in a smaller forum.  Ms. Holub never requested another meeting.  [Doc. 55, Ex. D ¶ 18.]

On September 25, Holub met with two members of the District's School Board, Fred Schaefer and Max Wilsey, and informed them that she believed the District would have $17 to $24 million in excess funds at the end of fiscal year 2012-2013.  [Doc. 34 ¶21.]  Holub showed them her calculations and claimed that someone had been using a "plug" to hide the excess expenses.  [See id.]  Holub indicated she had not raised this issue with Superintendent Gdowski or CFO Becker because she was concerned about retaliation.  [Doc. 55, Ex. I at 10.]  Dr. Schaefer asked Holub why she would put her neck out; she replied:  "I believe it is my job. I believe that I am to be independent because I should audit everyone. I believe it is my job to report to the board if Management is doing something I think the Board should know about."  [Id.]  Dr. Schaefer indicated that he agreed with Holub. [See id.]  Holub e-mailed documentation of her concerns to Dr. Schaefer following the meeting, but Dr. Schaefer did not forward that material to anyone else.  [Doc. 55, Ex. X.]

Dr. Schaefer and Mr. Wilsey met with Superintendent Gdowski on September 27, 2012 to discuss Holub's concerns.  Superintendent Gdowski explained the process the District had gone through to explain to Holub why her claim of inflated budgeted salary expenses was inaccurate.  Dr. Schaefer and Mr. Wilsey were satisfied that the issue had already been addressed and concluded that they did not need to pursue it any further.  [Doc. 55, Ex. D ¶ 19; Ex. X ¶ 5.]

9

Sometime in early October 2012, Superintendent Gdowski, CFO Becker, and Chief HR Officer Hinson met to discuss Holub's inability to move forward from her budget accusations and work productively with CFO Becker. It appeared to them that Holub had developed a personal vendetta against CFO Becker that had overridden any objectivity she (Holub) may have previously had. Gdowski, Becker and Hinson collectively decided to terminate Holub's employment. [Doc. 55, Ex. D ¶ 21; Doc. 55, Ex. W ¶ 4-5.]

Chief HR Officer Hinson and CFO Becker met with Holub on October 19, 2012. Hinson informed Holub that the District believed that Holub's "personalization" of her budget-related work over the previous four months dramatically impacted her "ability to be unbiased in her approach, supportive of Board of Education decisions, and an effective team member in the Financial Services Department." [Doc. 55, Ex. N.] Hinson further emphasized Holub's poor professional relationship with her immediate supervisor, CFO Becker. [Doc. 55, Ex. N; Ex. W ¶ 6.] Hinson also went over the School District's efforts to address Holub's concerns regarding the 2012-2013 budget and identified other issues with Holub's performance. Holub was given an opportunity to respond to each of these issues, but Mr. Hinson found her responses unpersuasive. At no time during the meeting did Chief HR Officer Hinson or CFO Becker raise any issues with Holub's communications with teachers' union officials, as they were unaware of such communications at the time of the meeting. [Doc. 55, Ex. E ¶ 10; Ex. W ¶ 8; Ex. D ¶ 23.] At the conclusion of the October 19, 2012, meeting, Hinson informed Holub that her employment was being terminated. [Doc. 34 ¶ 27].

In a letter to Holub dated October 26, 2012, Chief HR Officer Hinson summarized their pre-termination meeting and the reasons why the District decided to fire her. [Doc. 55, Ex. N.] The letter does not mention Holub's communications with union representatives. [See

id.]  The letter stated that Holub would be on paid administrative leave through October 31, 2012 and that her contract would be terminated effective November 1, 2012.  [Id.]

The School District's collective bargaining agreement with the local teachers' union provides for the parties to participate in a formal fact-finding proceeding before a neutral third party if the sides cannot negotiate an agreement.  Apparently that process was triggered and a fact-finding hearing was scheduled to begin on October 29, 2012.  The parties did not exchange witness lists beforehand.  [Doc. 55, Ex. D ¶ 22.]  When the District received the teachers' union's witness list on October 29, it learned that Holub was scheduled to testify on the union's behalf.  Holub's testimony and the union attorney's questioning of the School District's witnesses made Defendants realize that Holub had provided the union with information she obtained while working as the District's Internal Auditor.  [Doc. 55, Ex. D ¶¶ 23-24; Ex. E ¶ 10; Doc. 55, Ex. W ¶ 8.]  Given that revelation, Chief HR Officer Hinson sent Holub another termination letter on October 29, 2012, which added a section noting that the District was in a contested proceeding with the teachers' union and that Holub breached her fiduciary duties to the District by disclosing confidential and privileged information to the union.  [Doc. 55, Ex. N at 6.]

On November 1, 2012, Holub submitted her on-line application for unemployment benefits, stating as follows:

The District stated "the District reached a point where they did not find the employment relationship as mutually beneficial" because I looked into the budget and found it was inflated with unsubstantiated expenditures and they retaliated and fired me. The poor relationship with my immediate supervisor is because she did not want me looking into what she was doing. *I was doing my job as an internal auditor*, and although per my job description she was my supervisor I was in my own department which was Internal Audit and *it was my job to look into anything having to do with district finances and bring problems/issues to the attention of Management and the Board when necessary*. They

retaliated against me for going to the Board because management did not want me going to the board.

[Doc. 55, Ex. O (emphasis added).]

On December 5, 2012, Holub submitted a written statement to the Department of Labor responding to the District's statement as to why it fired her. [Doc. 55, Ex. I.] Holub affirmed repeatedly that she was acting within the scope of her job duties when she reported her concerns both to School District management and to the Board:

- "I was fired in retaliation for doing my job and bringing my concerns to the Superintendent and the Board" [id. at 3];

- "Mark Clark [Board President] said I should not worry about retaliation that I am doing what they hired me to do" [id. at 9];

- "**I believe it is my job to report to the board if Management is doing something I think the Board should know about. Fred [Schaefer] said he would agree.**" [id. at 10 (emphasis in original)];

- "I did not 'personalize' the budget, I did my job and when I had a differing view then [sic] management that I felt was important I brought it to the Board, to make sure the Board knew the issues that I saw. I am not in the Financial Services Department; I am in the Internal Audit Department proven by my job description, the budget book with my own pages and me as the contact person. I have never been part of the Financial Services Department because that would be a conflict of interest; I am just to report to the CFO per my job description no different than the CFO Reporting [sic] to the Superintendent but not being in Central Administration department" [id. at 13-14].

On February 4, 2013, Denver's Fox affiliate televised a story about the District's budgeting practices. The story included a pre-recorded interview with Holub in which she asserted that the District had inflated its budgeted salary figures by $17 million. [Doc. 55, Ex. D ¶ 26; Ex. E ¶ 12.] The story also included a pre-recorded interview with a Professor Sorenson from the University of Denver, who obtained data and modeling information from Holub and supported her conclusions. Superintendent Gdowski also sat for a pre-recorded

interview.  Knowing that the story was going to air, Superintendent Gdowski posted an open letter to the District's staff, parents, and community members on the District's website on February 4.  [Doc. 55, Ex. P.]  In the letter, Superintendent Gdowski said that Holub's allegations of unethical and illegal budgeting practices were "absolutely false," as confirmed by the review of both Vody Herrmann and the District's external auditors.  [Id.] Superintendent Gdowski also questioned Holub's credibility because of her involvement with the teachers' union and stated that she had "abandoned her fiduciary responsibility" to the District by giving the union confidential information.  [Id.]  Superintendent Gdowski attached a copy of a letter from Vody Herrmann, confirming that she had found no merit to Holub's accusations that the District was hoarding or hiding money.  [Id. at 3.]

On February 11, 2013, Holub initiated this lawsuit.

## DISCUSSION

Holub claims that Defendants retaliated against her, in violation of the First Amendment, for:  (1) reporting her concerns regarding inflated salary expenses to District management and School Board members Clark, Schaefer and Wilsey; and (2) reporting the allegedly inflated salary expenses to two members of the teachers' union.

Defendants argue that Holub cannot sustain a First Amendment retaliation claim based on her first contention because her statements to the School Board members were made pursuant to her official duties.  [Doc. 55 at 20-25.]  "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).  The determination of whether speech is made pursuant to an employee's official duties "is a

practical one," id. at 424; "[t]he ultimate question is whether the employee speaks as a citizen or instead as a government employee – an individual acting 'in his or her professional capacity.'" Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1203 (10th Cir. 2007) (citing Garcetti). The Tenth Circuit "[has] stated that speech is made pursuant to official duties if it is generally consistent with 'the type of activities [the employee] was paid to do.'" Id. (quoting Green v. Bd. of County Comm'rs, 472 F.3d 794, 801 (10th Cir. 2007)).

Here, Holub's job duties included "[d]etermin[ing] the adequacy and effectiveness of the [D]istrict's systems of internal accounting and operating controls[]"; "[r]eview[ing] the reliability and integrity of financial information and the means used to identify, classify and report such information[]"; and reporting results of internal audits to "members of management" and to "stakeholders." [Doc. 55, Ex. C.]

When Holub expressed concern about reporting directly to the CFO, she sent Superintendent Gdowski excerpts from the Attribute Standards from the Institute of Internal Auditors' website; the Standards stressed that a "chief audit executive" should have organizational independence by having direct access to the board of the organization. Holub characterized herself as the School District's "chief audit executive."

When Holub raised issues with the District's budget practices, she repeatedly stated that she thought it was her job to report to the Board if management was doing something wrong. And after her employment was terminated, Holub repeatedly stated that the School District simply fired her for doing her job. [Doc. 55, Exs. I & O.]

Taking all of this together, it is clear that Holub was speaking pursuant to her official duties when she raised issues regarding the District's budget practices with District management and School Board members.

Holub contends that the District "told Ms. Holub that it was not within the scope of duties to report to the school board" because General Counsel Karstaedt denied Holub's request to make her concerns known to the Board.  [Doc. 57 at 18.]  That is a mischaracterization of the evidence.   When Holub asked to present her findings and concerns to the Board, both Superintendent Gdowski and General Counsel Karstaedt stated that it was up to the Board to decide whether a formal presentation was warranted.   In addition, the record shows that Superintendent Gdowski, School Board President Clark, and School Board Member Schaefer all stated that Holub was doing what she had been hired to do.

The case Holub primarily relies on, <u>Casey v. West Las Vegas Independent Sch. Auth.</u>, 473 F.3d 1323 (10th Cir. 2007), actually undercuts her position.  There, the Tenth Circuit held that Casey, a school district superintendent, acted within the scope of her job duties in reporting improprieties with the district's Head Start program to her school board, and in ordering her subordinate to report the improprieties to federal authorities.  The Court further held that the superintendent acted outside the scope of her job duties when she filed a written complaint with the state attorney general's office that the school board was violating the state's open meetings act.  "It was when Casey went beyond her supervisors and reported to someone outside her chain of command about a matter which was not committed to her care that [the Tenth Circuit] found that her speech was protected by the First Amendment." <u>Thomas v. City of Blanchard</u>, 548 F.3d 1317, 1325 (10th Cir. 2008) (construing <u>Casey</u>).  By contrast, Holub reported her concerns to CFO Becker, Superintendent Gdowski, and members of the School Board, each within her chain of command, on matters within her job responsibilities.

Holub's First Amendment retaliation claim based on her first contention fails because her statements to School Board members were made pursuant to her official duties and thus were not protected speech.

As for Holub's second retaliation contention, Defendants concede that she engaged in conduct protected by the First Amendment when she reported her budget concerns to members of the teachers' union.  [Doc. 55 at 25.]  Holub must also show that Defendants would not have reached the same employment decision in the absence of her protected conduct.  See Dixon v. Kirkpatrick, 553 F.3d 1294, 1302 (10th Cir. 2009).  According to Holub, her involvement with the teachers' union was a motivating factor in Defendants' decision to fire her because she "did not lose her employment until November 1, 2012, and she was still an employee on October 29, 2012, when [Chief HR Officer] Hinson wrote that she was being terminated for her communication with the union."  [Doc. 57 at 17.]

Regardless of when Holub's employment technically ceased, she was fired on October 19, 2012.  There is no record evidence showing or suggesting that any Defendant was aware of Holub's involvement with the union at that point.  Defendants sent Holub a letter on October 26 giving various reasons why her employment was being terminated; her communications with teachers' union representatives were not among them.  It was only after the union revealed Holub as a witness in the fact-finding proceeding on October 29, 2012 that the Defendants learned of the communications and Chief HR Office Hinson sent Holub an additional termination letter that included them as another reason for the District's decision.  Given these facts, a reasonable juror could not conclude that the School District would not have terminated Holub's employment in the absence of Holub's protected conduct.

16

Plaintiff attempts to hold the School District liable for the alleged retaliation by its official policymakers.  [Doc. 34 ¶¶ 33-34.]  "[A] municipality may not be held liable where there was no underlying constitutional violation by any of its officers."  Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Because the School District's officers did not violate the First Amendment by terminating Holub's employment, it follows that the School District cannot be liable for retaliation on a municipal liability theory.

Holub's employment contract with the School District provided:  "Throughout the term of this Contract, . . . the Administrator may be terminated for cause."  [Doc. 55, Ex. B ¶ 9.] The term "cause" is  not defined.  Holub claims that the School District breached the contract because it did not have "cause" to terminate her employment.

The School District's reasons for terminating Holub's employment were explained to her during her October 19 meeting with Chief HR Officer Hinson and CFO Becker, and in the October 26 letter the School District sent to her.  The "overarching basis" for the District's decision was its position that Holub's "personalization of budget-related work for the past four months . . .  had a dramatic impact on [her] ability to be unbiased in [her] approach, supportive of Board of Education decisions and an effective team member in the Financial Services Department."  [Doc. 55, Ex. N at 2.]   The District attributed Holub's "poor professional working relationship" with CFO Becker to Holub's personal "[attacks] on the competency and ethics" of Becker during the meetings the District held to address Holub's concerns.  [Id.]  The District noted that even though it tried to address Holub's concerns in a constructive manner, her "tone, tenor and negative approach remained virtually the same" [id.]; that Holub was unwilling to accept Vody Herrmann's independent conclusion that there was nothing illegal or unethical about the District's budget practices [id. at 3]; and that after

Herrmann presented her findings, Holub "made no attempt to move forward and work in a collaborative manner" [id.].  Based on those circumstances, the District concluded that Holub was "unable to successfully execute all aspects of the position [she held] in an effective and positive manner."  [Id.]

Holub claims that there is a factual dispute as to whether Superintendent Gdowski and CFO Becker, "who were in charge of the entire process, knew exactly what was going on[]" and manufactured cause to terminate Holub's employment as a pretext for their true motivation:  retaliating against Holub for exposing that the District "cooked the books." [Doc. 57 at 20-21.]  The factual dispute, Holub seems to say, is who was ultimately correct in their analysis of the School District's budget, which, according to her, is "[a] principal issue in this case . . . ."  [Doc. 66 at 1.]  Even assuming Holub's budget analysis was correct, the record shows that District management engaged outside experts and internal employees to conduct analyses of their own, and that District management explained their differing methodologies to Holub on a number of occasions.  This was unmistakably a dispute about accounting practices and conventions and there is no indication that the School District was feigning engagement in a debate with Holub just so it could ultimately fabricate a reason to fire her.  Holub apparently believes that if it is shown that she was right and the School District was wrong about the budget calculations, then the inference should be that there was a massive cover-up.  Based on the Court's review of the evidence, that inference is not plausible.

The undisputed evidence shows that the District had sufficient "cause" to terminate Holub's employment.  Holub's breach of contract claim accordingly fails.

Defendants argue that Holub's state tort claims against the School District are barred by the Colorado Governmental Immunity Act ("CGIA") because the School District is a public entity and has not waived immunity for the tort claims at issue here.  Holub acknowledges that her tort claims against the School District are barred by the CGIA.  [Doc. 57 at 21.]

Defendants argue that the CGIA bars Holub's claims for intentional interference with a contract and wrongful discharge in violation of public policy against both Superintendent Gdowski and CFO Becker; and Holub's defamation claim against Gdowski only.  [Doc. 55 at 29-36.]  Because Superintendent Gdowski and CFO Becker are public employees, and there is no applicable waiver of immunity, Holub can bring her tort claims against them only if she can demonstrate that their actions were "willful and wanton" within the meaning of the CGIA.  See Colo. Rev. Stat. § 24-10-118(2)(a).

Holub asserts that "intentionally lying to the public about $16 million of the public's money is enough to support a claim of willful and wanton conduct."  [Doc. 57 at 24.]  The evidence does not support Holub's assertion.  When Holub accused the District of illegal and unethical activities, the School District hired an independent investigator, Vody Herrmann, a well-respected figure in the field of school budget and finance, to investigate.   If Superintendent Gdowski and CFO Becker were in fact involved in a cover-up, it defies common sense that they would, on their own volition, engage an independent expert to review the very books they are alleged to have cooked.  Based on 70 hours of reviewing the issue, Herrmann "found no merit to [Holub's] allegations"—"there were no grounds to support the charges of unethical or illegal behavior[]"; "[n]o funds were hidden[]"; and "[t]he district [was] not hoarding money . . . ."  [Doc. 55, Ex. P at 3.]  Holub may disagree with

Herrmann's calculations, but Holub does not provide any basis for the Court to question that Herrmann undertook her review, and Defendants relied on her conclusions, in good faith.

Holub also claims that "willful and wanton" conduct can be inferred because, after CFO Becker found out that Tracey Cantrell told Holub about the budget discrepancies, Becker "came into [Tracey] Cantrell's office; pressed her body against Ms. Cantrell's back forcing [sic] Ms. Cantrell's chest against her desk; and, with her lips on Ms. Cantrell's hair, said 'How dare you go above my head.'" [Doc. 57 at 21.] This incident is in dispute. Even assuming Holub's account is true, Becker's conduct is that of a supervisor frustrated by a subordinate's perceived insubordination; the conduct has little, if anything, to do with intentional interference with an employment contract, unlawful discharge, or defamation against Holub. CFO Becker's conduct, as characterized by Holub, does not rise to the level of willful and wanton, either.

Holub premises her defamation claim against Superintendent Gdowski on two statements in the letter he wrote to School District staff and parents when he realized a story detailing Holub's allegations was going to air on the local Fox affiliate. The first statement is as follows: "This former employee continues to allege the district has engaged in unethical and illegal budgeting practices. **This is absolutely false**. This has been confirmed through a review of our practices by multiple experts." [Doc. 55, Ex. P (emphasis in original).] Holub claims that Superintendent Gdowski knew that the statement was false because he was involved in "cooking the books" [Doc. 57 at 25], but again, there is no evidence actually supporting Holub's allegations of book cooking. There is no evidence supporting a reasonable conclusion that this statement was willful or wanton.

Holub also objects to the following statement in Superintendent Gdowski's letter:

> Also of note, the credibility of disgruntled former employee Ms. Holub is questionable given she chose to represent the district's teachers' union in negotiations while she was employed as an administrator of the district. Through this action alone she abandoned her fiduciary responsibility to the district and board of education.

[Doc. 55, Ex. P.]  According to Holub, Superintendent Gdowski is an attorney and should have known, but was deliberately indifferent to, the fact that Holub's "fiduciary responsibilities" were to the taxpayers.  [Doc. 57 at 25.]  The District is governed by an elected Board of Education.  They are the representatives of the taxpayers and it is to them that District employees owe a fiduciary duty.  Gdowski's second statement does not amount to willful and wanton conduct.

The evidence provided by Holub does not support a reasonable finding that Superintendent Gdowski and CFO Becker acted willfully and wantonly.  Accordingly, Holub's state tort law claims against them are barred by the CGIA.

## CONCLUSION

Upon the foregoing, it is

ORDERED that Defendants' Motion for Summary Judgment [Doc. 55] is granted. The clerk shall enter judgment for Defendants, dismissing this civil action and awarding costs.

Dated: September 12, 2014

BY THE COURT:

s/Richard P. Matsch
_____

Richard P. Matsch
Senior District Judge